

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-15-00100-CV

IN THE INTEREST OF K.O., A.O., AND O.O., CHILDREN

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2014-1026-DR

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

OPINION

The Texas Department of Family and Protective Services (the Department) filed a petition to terminate Janna Bravo's and Matthew Osler's parental rights to their children, seven-year-old Kendrick, and eighteen-month-old twins, Anna and Ophelia.[1] The trial court terminated Janna's and Matthew's parental rights after finding that (1) they engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, (2) they failed to comply with the provisions of a court order that established the actions necessary for them to obtain the return of the children after they were left in conservatorship of the Department for not less than nine months as a result of their removal for abuse or neglect, and (3) termination of their parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (O), (2) (West Supp. 2015).[2]

In her first and second points of error on appeal, Janna, who was incarcerated at the time of trial, argues that the trial court erred when it held, in her absence, the final hearing and hearing on a motion for new trial. She also argues that her counsel rendered ineffective assistance in failing to secure her presence for trial. Matthew argues that the evidence was legally and factually insufficient to support the trial court's findings that grounds for terminating his parental rights had been met. While Matthew challenges only the factual sufficiency of the evidence supporting the

---

[1]To protect the confidentiality of the children involved, this Court will refer to all involved parties by fictitious names. *See* TEX. R. APP. P. 9.8(b)(1), (2).

[2]Janna's parental rights were also terminated on other grounds.

best-interest finding, Janna argues that the evidence was both factually and legally insufficient to support that finding.

We find that Janna failed to preserve her complaints that the trial court erred in conducting the trial and holding a hearing on her motion for new trial in her absence and that she has failed to demonstrate ineffective assistance of counsel. We further find that termination of Janna's and Matthew's parental rights was supported by legally and factually sufficient evidence. Accordingly, we affirm the trial court's judgment.

## I.    Janna Did Not Timely Raise Her First Two Complaints on Appeal

During the pendency of this case, Janna was incarcerated in the Gregg County Jail. She was transferred to the Galveston County Jail on the eve of trial, in order to give birth to another child. As a result, notice of the date of trial reached Janna later than her counsel anticipated and resulted in her absence at trial. Without a motion for a bench warrant, Janna's counsel announced ready for trial.

Following the trial court's termination of Janna's parental rights, Janna's counsel filed a motion for new trial arguing that the evidence was legally and factually insufficient to support the court's ruling. In a single sentence, the motion also stated, "Furthermore, because of Movant's health conditions at the time of trial, she was unable to attend the final hearing to present testimony on her behalf." Yet, the motion did not complain that any error resulted from Janna's absence.

The trial court held a brief hearing on the motion for new trial, which comprised less than eight pages of transcript. At that hearing, counsel stated, "I will rest on the contents of my motion for new trial and the text there." After explaining the difficulty that he had in communicating with

3

Janna because she was in a different facility, counsel stated, "But we had already received an extension in this case, we were up against the drop dead date for going to trial. With that, I'll rest." Counsel did not argue that trying the case in Janna's absence was error. Further, he did not attempt to ask the court to consider any additional evidence that Janna might have provided. The trial court denied the motion for new trial on December 4, 2015, and Janna appealed.

Thereafter, Janna filed a bill of exception. Her appellate complaints that the trial court violated her due process rights by trying the case and hearing the motion for new trial in her absence were first raised in a memorandum of law in support of the bill of exception filed on January 5, 2016. The bill of exception included an affidavit signed by Janna explaining the circumstances of her transfer to a different facility, which left her only a few days to communicate with counsel. Her affidavit stated, "I did not know at the time that there was also available the option of the court appearance by telephone . . . . I would have liked to appear telephonically if the bench warrant was not possible. However, a telephonic appearance was not offered to me; so I was not able to appear using that telephonic means." Janna swore that she would have testified about the services that she completed. With respect to the best-interest finding, Janna stated, "I would have also testified that I love my children and believed that it was in their best interests to be re-united with me, and that it would not be in their best interests for termination of the parental bond between us."

The trial court held a hearing on the bill of exception. Because the memorandum supporting the bill and Janna's affidavit were all created after the motion for new trial was denied, the Department argued that the bill of exception was being used to create new evidence. Following

4

this argument, the court noted that the issues raised in the bill of exception were novel issues, not previously brought to the trial court's attention. The court also reminded counsel that it never received a request for a bench warrant and was never asked to secure Janna's presence by telephone. The trial court added that "[t]here was no evidence presented at all at the motion for new trial. There [were] no affidavits presented. . . . There was no evidence whatsoever presented to this Court that his client was -- had any type of health issue that prevented her from being here, that he had ever asked the Court to have her here, or anything of the like."

Nevertheless, the trial court found and approved a bill of exception that stated (1) that Janna was incarcerated at the time of trial in Galveston County, (2) that Janna's counsel was unaware that she was giving birth to a child in a facility different than the one to which he had sent correspondence, (3) that Janna did not receive counsel's correspondence until a week before trial, (4) and that Janna's reply did not reach him until a few days before trial, "perhaps upward of a week before trial, thereby lending him little time to communicate with her." The court also took judicial notice of the availability of telephonic hearing.

"[T]he rules governing error preservation must be followed in cases involving termination of parental rights, as in other cases in which a complaint is based on constitutional error." *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005). Janna relies on the bill of exception to preserve her first two complaints on appeal. "The purpose of a bill of exceptions is to allow a party to make a record for appellate review of matters that do not otherwise appear in the record, such as evidence that was excluded." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006) (citing TEX. R. APP. P. 33.2; TEX. R. EVID. 103(a)(2)); *see Clamon v. DeLong*, 477 S.W.3d 823, 826 (Tex. App.—

5

Fort Worth 2015, no pet.); *Diggs v. Diggs*, No. 14-11-00854-CV, 2013 WL 3580424, at \*8 n.13 (Tex. App.—Houston [14th Dist.] July 11, 2013, no pet.) (mem. op.) ("Generally, to preserve error in the exclusion of evidence, a party must attempt *during the evidentiary portion of the trial* to introduce the evidence."). The bill of exception does not excuse the requirement for an appellant to timely raise issues before the trial court "[a]s a prerequisite to presenting a complaint for appellate review." TEX. R. APP. P. 33.1(a)(1).

Janna could not circumvent the requirement to preserve her complaints by making them to the trial court in a timely manner. Because Janna waited until after the notice of appeal was filed to raise novel issues in her bill of exception, we conclude that she failed to preserve for our review her complaints that the trial court violated her due process rights by conducting a trial and holding a hearing in her absence. Accordingly, we overrule these points of error.[3]

## II. Janna Cannot Demonstrate that Counsel Rendered Ineffective Assistance

"In parental-rights termination cases in Texas . . . brought by the Department[,] an indigent person has a statutory right to counsel." *In re J.M.A.E.W.*, No. 06-14-00087-CV, 2015 WL 1119761, at \*3 (Tex. App.—Texarkana Mar. 13, 2015, no pet.) (mem. op.) (citing TEX. FAM. CODE. ANN. § 107.013(a) (West 2014); *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003)). "This statutory right to counsel also embodies the right to effective counsel." *Id.* (citing *M.S.*, 115 S.W.3d at 544). "The standard used for parental-rights termination cases is the same as that used in criminal cases and is set forth in *Strickland*." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668

---

[3]In her brief, Janna also argues that the trial court erred by failing to secure her presence sua sponte. Again, this issue was not timely preserved. Furthermore, the Texas Supreme Court has ruled that "an inmate does not have an absolute right to appear in person in every court proceeding." *In re Z.L.T.*, 124 S.W.3d 163, 165 (Tex. 2003).

(1984)).  "The right to effective assistance of counsel does not guarantee, however, 'errorless or perfect counsel whose competency of representation is to be judged by hindsight.'"  *Id.* (quoting *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006)).

"To prevail on [her] ineffective assistance claim, [Janna] must prove by a preponderance of the evidence that (1) [her] counsel's performance was deficient, that is, that it fell below an objective standard of reasonableness; and (2) it is reasonably probable that, except for [her] counsel's unprofessional errors, the outcome of the proceeding would have been different."  *Id.* at *4 (citing *Strickland*, 466 U.S. at 687–88, 694).  "Failure to satisfy either prong of the *Strickland* test is fatal."  *Id.* (citing *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

"To support a finding that [Janna]'s trial counsel was ineffective, the trial record must affirmatively demonstrate his deficiency."  *Id.* (citing *Bermea v. Tex. Dep't of Family & Protective Servs.*, 265 S.W.3d 34, 43 (Tex. App.—Houston [1st Dist.] 2008), *pet. denied*, 264 S.W.3d 742 (Tex. 2008) (per curiam)).  "In reviewing trial counsel's performance, we take into account the circumstances surrounding the case and focus primarily on whether the manner of his performance was reasonably effective."  *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006) (per curiam); *M.S.*, 115 S.W.3d at 545).  "We give great deference to trial counsel's performance and indulge a strong presumption that his conduct falls within the wide range of reasonably professional assistance."  *Id.* (citing *H.R.M.*, 209 S.W.3d at 111; *M.S.*, 115 S.W.3d at 545).  "This includes the possibility that his actions were strategic."  *Id.* (citing *H.R.M.*, 209 S.W.3d at 111; *M.S.*, 115

7

S.W.3d at 545). "We only find ineffective assistance if the conduct is 'so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *H.R.M.*, 209 S.W.3d at 111).

Here, although there was ample opportunity to arrange for a bench warrant or telephonic appearance, none was ever requested. Janna argues that the failure to make these requests constituted ineffective assistance of counsel. However, the record is unclear on counsel's reasoning for failing to secure Janna's presence for trial. The bill of exception proved that counsel's notice of the date of trial reached Janna in time for her to send a response to her counsel and that her counsel received Janna's response prior to trial. We are free to presume that Janna's letter to counsel did not contain her desire to be present at trial. Further, as explained below, Janna had a history of drug use, crime, and Child Protective Services Division (CPS) involvement. Thus, we may also presume that counsel determined that it would be against Janna's best interests to be subjected to cross-examination or that she would not make a good witness at trial.

The record does not firmly establish counsel's deficiency, and we can determine strategic reasons for counsel's failure to secure Janna's presence at trial. Thus, we conclude that Janna has failed to demonstrate that her counsel's representation constituted ineffective assistance. *See In re K.M.H.*, 181 S.W.3d 1, 13 (Tex. App.—Houston [14th Dist.] 2005, no pet.). We overrule Janna's third point of error.

## III. Sufficient Evidence Supports Termination of Matthew's and Janna's Parental Rights

### A. Standard of Review

We strictly scrutinize termination proceedings in favor of the parent. *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (citing *Holick v. Smith*, 685 S.W.2d

8

18, 20 (Tex. 1985)).  To terminate an individual's parental rights to her child, clear and convincing evidence must show:  (1) that the parent has engaged in one of the statutory grounds for termination; and (2) that termination is in the child's best interest.  TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2015); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).  The clear and convincing burden of proof has been defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *C.H.*, 89 S.W.3d at 23; *see* TEX. FAM. CODE ANN. § 101.007 (West 2014).  Due process demands this heightened standard. *E.N.C.*, 384 S.W.3d at 802 (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)).  Thus, in reviewing termination findings, we determine whether the evidence is such that a jury could reasonably form a firm belief or conviction about the truth of CPS's allegations.  *C.H.*, 89 S.W.3d at 25.

In a legal sufficiency review, termination findings are given appropriate deference.  *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 679 (Tex. App.—Austin 2005, no pet.).  In such cases, we consider all the evidence in the light most favorable to the findings to determine whether the jury could reasonably have formed a firm belief or conviction that the grounds for termination were proven. *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.).  We assume that the jury resolved disputed facts in favor of the findings if a reasonable jury could do so.  *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *J.P.B.*, 180 S.W.3d at

9

573. Conversely, we disregard evidence that the jury may have reasonably disbelieved or testimony from witnesses whose credibility may reasonably be doubted. *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *J.P.B.*, 180 S.W.3d at 573.

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine "'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'"" *Id.* (alteration and omission in original) (quoting *H.R.M.*, 209 S.W.3d at 109). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). "'[I]n making this determination,' we must undertake "'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'"" *Id.* (alteration in original) (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

### B.    The Evidence at Trial

The investigation in this case began on May 10, 2014, when Kevin M. Rankin, an officer with the Longview Police Department, responded to a domestic disturbance call involving Matthew and Janna. Rankin's testimony established that Matthew had committed acts of domestic violence against Janna in the children's presence. According to Rankin, Janna reported that

Matthew had slapped her across her face, grabbed her neck, and choked her. He testified that Janna said she was going to pass out and honestly believed that Matthew was going to kill her. Rankin thought that Janna was concerned for the safety of her children because she told him that she left "the window open in case she needed to grab the kids and have a quick escape." Rankin noticed injuries on Janna that supported her account. He added that Janna claimed that Matthew had taken steroids before and had anger issues. Rankin arrested Matthew for assault family violence and referred the case to CPS. Additionally, a protective order was entered preventing Matthew from communicating with or going near Janna and the children.

Ashley Moore, a former investigator with CPS, interviewed Kendrick, who explained the reason for the domestic disturbance. Moore testified, "He said that his dad got home from work . . . [and] found something that was weird, which looked like a pen with stuff on it. He said his dad had thought it was a needle, and from what he told me, you know, dad and mom engaged in physical altercation with each other." Moore discovered that Janna had a criminal history involving possession of controlled substances. Her conversation with Janna led to Janna's admission that she used methamphetamine while the children were at home on May 1, 2014, and opiate pills ten days later. Janna signed an acknowledgment of substance abuse form and agreed to take a drug test.

Moore's investigation uncovered the extent of Janna's history of drug use. She testified that one of Janna's older children, not the subject of this case, tested positive for drugs on the day he was born and that Janna admitted in a previous CPS investigation to smoking "one or two joints a week while pregnant" with that child. Kelsey Drennan, an investigator with CPS, testified that

11

she previously investigated Janna on allegations that she was using drugs and was not providing proper nutrition to Kendrick. Drennan was concerned about the possibility that Kendrick was present at a time when Janna was using methamphetamine. She drug tested Kendrick, who tested positive for methamphetamine. In the course of her investigation, Drennan found that Janna "had many previous CPS cases . . . regarding some older children that she had." According to Drennan, "in those cases [Janna] was found to be using drugs, whether it was marijuana or methamphetamines." Drennan testified that Janna completed a drug treatment program, but "continued to use drugs, and then just became uncooperative." As a result, Janna's grandmother obtained custody of the two older children.

Janna also had a criminal history. Whitney Williams, a Department caseworker, testified that Janna had been in and out of jail during the children's lives. In 2011, Janna was placed on community supervision for theft. After violating the terms and conditions of her community supervision by ingesting methamphetamine, Janna's community supervision was revoked in 2013, and she was sentenced to twelve months' confinement in state jail. On January 22, 2014, shortly after Anna and Ophelia were born, Janna committed another theft offense. She was convicted of theft with two or more prior convictions and sentenced to fifteen months' confinement in state jail during the pendency of this case.

Matthew also had a criminal history. Drennan testified that Matthew was in prison at the time of her previous investigation involving Kendrick. In 2010, Matthew was convicted of the federal offense of possession with intent to distribute at least 200 grams but less than 350 grams of methamphetamine. He was imprisoned for forty-eight months. Laura Palafax, a U.S. Probation

12

and Pretrial Services officer in the Eastern District of Texas, testified that following his imprisonment, Matthew was placed on a four-year term of supervised release, subject to certain terms and conditions. Palafax testified that Matthew was receiving mental health and substance abuse treatment, but admitted that he used illegal drugs in September 2013 and October 2015. Specifically, Matthew had a positive drug test in the same month that the termination trial was held and admitted to using methamphetamine at that time. Palafax testified that Matthew's admissions of drug use would be used to revoke his supervised release. She also added that his pending misdemeanor charge of violating a protective order and his assault family violence charge would trigger the report that Matthew violated the conditions of his supervised release.

The trial court ordered Matthew and Janna to comply with each requirement set out in the Department's family service plans. Williams testified that Matthew did not complete drug treatment, did not comply with random drug testing requirements, and failed to maintain employment or keep in contact with CPS. Due to Matthew's failure to cooperate, Williams testified that CPS could not complete a home study and that Matthew failed to demonstrate that he could provide safe and appropriate housing for his children. According to Williams, Matthew did not attend the Department's drug treatment or counseling program and had not spoken to the caseworker about plans for the children's future. Also, Matthew did not complete the batterers' intervention program and violated a protective order by communicating with Janna. Williams opined that Matthew could not provide for the security and safety of the children.

Williams also testified that Janna failed to complete her family service plan, although she completed "the peer educator health training program parenting skills class." Williams clarified

13

that Janna was not incarcerated between June and November 2014 and January through March 2015 and could have made progress towards completing her plan during these times. Due to her pattern of drug use and incarceration, Williams testified that Janna could not meet the physical or emotional needs of the children. She added that Janna had not communicated her plans to establish a home for the children.

Williams testified that the children were doing well in their current placement. She stated that Kendrick loved his foster parents and had grown attached to them. According to Williams, Kendrick's foster mother reported that Kendrick was feeling nervous and afraid before visitations with Matthew and tended to lash out after the visits. Williams stated that Kendrick was in counseling and would need to continue those sessions. She stated that the Department's goal was for all three children to be placed for adoption.

Amy Smith, a second grade teacher, testified that she and her husband were fostering Kendrick, Anna, Ophelia, and the baby born to Janna while she was in jail. Smith testified that Anna and Ophelia were "developmentally behind." The eighteen-month-old twins were not talking or walking. Conversely, Smith stated that Kendrick was very advanced. Smith said that the twins had flourished and that Kendrick was doing well in school and was making straight As since the placement. Smith added that Kendrick was reading at an "end-of-the-year third grade level" and was referred to the gifted and talented program. However, Smith testified that Kendrick suffered from emotional issues and would get very anxious before visits with Matthew. After visits, Kendrick would fight in school, cut his hair, and cut holes in his clothing. Smith stated that Matthew had telephone contact with Kendrick, but that Kendrick was not keen on speaking with

him at times. She stated that Janna had no contact with the children for several months. Smith stated that the twins called Smith and her husband "Mom" and "Dad" and stated that Kendrick had also become attached to them. Smith testified, "If things went the way that we would hope, we would love to apply for adoption if the Court allowed."

Matthew testified that he completed parenting and psychological services and took an anger management class, but could not complete it due to his work schedule. Matthew told the court that he wanted to finish the anger management courses and did not want to lose his children. Matthew testified that he was employed by Trinity Industries until August 2015 and that since then, he had been self-employed "laying floors." Matthew testified that he had a three bedroom, two bathroom trailer where the children could reside with him. Matthew stated that if he and Janna were both incarcerated, the children could live with Janna's sister. If he was incarcerated but Janna was free, Matthew wanted the children to live with Janna "if she proved herself worthy."

Matthew admitted that the children witnessed his arrest and that Janna used methamphetamine on some occasions since she had been out of prison. Matthew claimed that he missed a previously scheduled drug test because CPS referred him to a lady who was not present at the drug-testing facility at the time he went to be tested. He admitted that he tested positive for drugs during the month of the termination hearing, but suggested that his drug use was excused because he was stressed out about losing his children. Matthew had a total of eight children and had child support arrearage for at least one of the children not involved in this termination case. Matthew testified that he did not know whether the court-ordered child support payment for Kendrick's, Anna's, and Ophelia's benefits had been made in this case because it was supposed to

15

be coming out of his check from Trinity Industries. He clarified that he had no proof he had paid child support during the pendency of this case.

After all the evidence was presented, the trial court decided to terminate Matthew's and Janna's parental rights.

### C. Sufficient Evidence Supported Predicate Finding Against Matthew Under Section 161.001(b)(1)(O)

Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the children's best interests. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). "If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights." *K.W.*, 335 S.W.3d at 769 (quoting *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.).

Ground O requires the Department to prove that a parent has

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(b)(1)(O).[4]

---

[4]The fact that the children were in the Department's care for not less than nine months as a result of their removal for the abuse or neglect is uncontested.

Here, the Department met its burden under Ground O. The evidence at trial established that Matthew was under court order to comply with all requirements of the Department's family service plan. Under that plan, Matthew was required to maintain contact with the caseworker on a monthly basis, maintain stable housing, complete a twenty-eight week anger management course, and submit to random drug tests. Williams testified that Matthew failed to maintain contact with her and that he failed to demonstrate that he was maintaining stable housing. Williams said that Matthew was moving about and was living "pillar to post" until later on in the case.

Matthew admitted that he failed to complete the Department's anger management course. The Department proved that Matthew did not submit to random drug tests, and Matthew admitted that he tested positive for methamphetamine in the month of the termination trial. We find the evidence legally and factually sufficient to support the trial court's finding under Ground O. Accordingly, we overrule Matthew's first point of error.

### D. Sufficient Evidence Supported the Best-Interest Findings

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interest of the child, courts consider the following *Holley* factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the

future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see E.N.C.*, 384 S.W.3d at 807; *see also* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2015).

### 1.   Legally and Factually Sufficient Evidence Supported the Trial Court's Findings that Termination of Janna's Parental Rights Was in Each Child's Best Interest

The first *Holley* factor involves the desires of the children. Anna and Ophelia were too young to verbalize their desires. However, Janna was incarcerated shortly after the twins were born, and Smith said that the children had not seen Janna for months. The Department introduced evidence that the twins were bonded to their foster parents and referred to them as "Mom" and "Dad." From this evidence establishing the twins' limited contact with Janna during their lifetimes, the trial court could infer that the twins would prefer to remain in the foster parents' stable, loving environment. *See In re J.K.V.*, No. 06-15-00063-CV, 2016 WL 269134, at *4 (Tex. App.—Texarkana Jan. 22, 2016, no pet. h.). With respect to Anna and Ophelia, we find that the first *Holley* factor weighs in favor of terminating Janna's parental rights. However, while the evidence shows that Kendrick was attached to his foster parents, the evidence did not demonstrate that Kendrick, who was old enough to verbalize his desires, wished to remain apart from Janna. Accordingly, we find the first *Holley* factor neutral with respect to Kendrick.

As for the second and third *Holley* factors, the evidence showed that Janna could not meet the emotional and physical needs of the children and that she posed a danger to the children. The

18

evidence also established that Janna had poor parenting skills under the fourth *Holley* factor. Janna had a history of methamphetamine abuse.[5] Her drug use led to the removal of her older children and caused Kendrick to test positive for methamphetamine. Janna admitted that she used drugs in the home while Kendrick, Anna, and Ophelia were present. She also had a history of incarceration and demonstrated an inability to remain out of jail due to her drug use and poor choices. Smith testified that as a result of Janna's parenting, Anna and Ophelia were behind developmentally and that Kendrick required special counseling as a result of his emotional issues. Williams testified that Janna would be unable to take care of the children's needs. The trial court found that Janna engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being. Janna did not challenge this finding. She appeared to support herself and the children by committing acts of theft. From this evidence, the trial court could find that Janna could not adequately provide for the children's needs, that her failure to remain drug free in the children's presence presented a danger to them, and that she lacked the parenting skills and stability to take care of the children. *See id.* (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) ("lack of parenting skills, income, and home, and unstable lifestyle considered in determining parent's ability to provide for child's physical and emotional needs"); *J.O.A.*, 283 S.W.3d at 346 ("considering parent's history of irresponsible choices in best interest determination")).

---

[5]"A parent's drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest." *In re A.T.*, No. 06-14-00091-CV, 2015 WL 733275, at *5 (Tex. App.—Texarkana Feb. 18, 2015, no pet.) (mem. op.).

The Department had several programs to assist Janna. Although Janna completed a parenting class, Williams' testimony showed that Janna did not take advantage of all of the Department's services and that she failed to complete her family service plan. We find that the sixth *Holley* factor weighs in favor of terminating Janna's parental rights.

As for the last three *Holley* factors, Janna, a drug addict who was incarcerated at the time of trial, had no discernible plan for the children, according to Williams. If she were freed from incarceration, Janna would presumably have the kids live with her in her home. However, Janna admitted to using methamphetamine in that home, thereby contaminating it. There was also evidence suggesting that Janna would continue to subject the children to her volatile relationship with Matthew, should the children be returned to her. In spite of the domestic violence and the protective order entered against Matthew, Matthew testified that Janna had chosen to continue a relationship with him and that the two lived with each other when Janna was not in jail. In contrast, the Department established that Smith wanted to adopt the children and that her home was loving and stable. Janna offered no excuse for her acts or omissions. We find that the seventh, eighth, and ninth *Holley* factors weigh in favor of terminating Janna's parental rights.

In light of a full evaluation of Janna's circumstances, the reasons for terminating Janna's parental rights, and a balancing of the *Holley* factors, we find that the evidence was both legally and factually sufficient to support the trial court's best-interest findings. Accordingly, we overrule Janna's last point of error.

## 2. Factually Sufficient Evidence Supported the Trial Court's Findings that Termination of Matthew's Parental Rights Was in Each Child's Best Interest

Likewise, we find the evidence factually sufficient to support the best-interest findings against Matthew.

Under the first *Holley* factor, CPS introduced evidence (1) that Kendrick was often unhappy about his obligation to speak with Matthew over the telephone and lashed out after visits with him and (2) that Anna and Ophelia had limited contact with Matthew. In light of the evidence showing the nature of the children's bond with the foster parents, we find that the first *Holley* factor weighs in favor of terminating Matthew's parental rights with respect to all three children.

Next, "the amount of contact between the parent and child[, and] the parent's failure to provide financial and emotional support, continuing criminal history, and past performance as a parent are all relevant in determining the child's best interest." *A.T.*, 2015 WL 733275, at *5. Williams testified that Matthew regularly missed visitations with his children. According to Smith, Kendrick communicated with Matthew over the telephone for short periods of time, while the twins had little contact with Matthew. Matthew had a total of eight children and was under an obligation to pay child support for those children. The evidence demonstrated that Matthew failed to support his children, including Kendrick, Anna, and Ophelia. Through Palafax' testimony about Matthew's criminal history and her explanation of the likelihood that he would soon be incarcerated for violating conditions of his supervised release, CPS established, and Williams testified, that Matthew would soon be unable to meet the children's physical and emotional needs. We find that the second *Holley* factor weighs in favor of terminating Matthew's parental rights.

21

The remaining *Holley* factors also weigh against Matthew. Matthew committed acts of domestic violence against Janna. According to Rankin, Janna stated that Matthew had anger issues as a result of his use of steroids. Rankin also testified that Janna left a window open during the altercation so that the children could escape, indicating that she feared for her children's safety due to Matthew's demeanor. Matthew failed to complete anger management classes, and he violated a protective order to maintain his volatile relationship with Janna. He testified that he knew that Janna was using drugs in the home where the children lived. Yet, he left the children under Janna's care and told the court that his plan was for the children to live with Janna should he be incarcerated and she be free. Further, Matthew continued to use drugs during the pendency of the case, suggesting that he would do so if the children were returned to him. Although Matthew had the opportunity to complete the family service plan, he failed to do so. According to Williams, Matthew did not have a stable home until very late in the case. "A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child." *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). We find that the third through eighth *Holley* factors weigh in favor of terminating Matthew's parental rights.

Matthew offered some excuses for his acts and omissions. He claimed that he failed to report for a drug test because CPS's contact was not present at a drug-testing facility. The trial court, as the fact-finder, was free to disbelieve this testimony, in light of Matthew's positive drug test in October 2015. Matthew also claimed that he was uncertain about whether child-support payments were being made because the payments were supposed to be taken from his Trinity

Industries check, but he did nothing to ensure that his obligations were being met. Surprisingly, Matthew indicated that he used drugs in the month of the termination hearing because he was stressed out, indicating that the existing parent-child relationship was not an appropriate one. We find that the ninth *Holley* factor weighs in favor of terminating Matthew's parental rights.

After reviewing the evidence in balancing the *Holley* factors, we conclude that the trial court's findings that termination of Matthew's parental rights was in the best interests of the children were supported by factually sufficient evidence. Therefore, we overrule Matthew's last point of error.

## IV. Conclusion

We affirm the trial court's judgment.


Bailey C. Moseley
Justice

Date Submitted:     March 29, 2016
Date Decided:       April 14, 2016

23